**PYRENE–MINIMAX CORPORATION v. PALMER et al.**

**PYRENE–MINIMAX CORPORATION et al. v. AMERICAN FOMON CO. et al.**

Nos. 6590, 6591.

United States Court of Appeals for the District of Columbia.

Decided Feb. 1, 1937.

John Vaughn Groner, of New York City, and H. C. Kilpatrick, of Washington, D. C., for appellants.

Joseph G. Denny, Jr., of Philadelphia, Pa., Clarence M. Fisher, of Washington, D. C., and Ernest H. Merchant, of New York City, for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

These cases have their origin in certain decisions of the Patent Office in an interference proceeding involving applications for patents filed by Burmeister, as-

signor to Pyrene-Minimax Corporation, Palmer, assignor to Amdyco Corporation, and Urquhart, assignor to American Fomon Company.

The interference involved an invention for a method of extinguishing fire by means of covering the fire with foam created by the introduction of certain dry chemicals into a stream of water carried by a hose from a source of supply to a point of discharge, thus smothering the fire by depriving it of oxygen. The invention is said to be particularly serviceable in extinguishing oil fires, for the reasons, among others, that the production of foam by means of its operation is continuous, and the point of discharge can be brought near to the fire. It is said that since the increased production and storage of oil began, such extinguishers have become widely used in this country and abroad.

The application of Palmer, assignor of Amdyco Corporation, was filed November 20, 1926 for reissue of a patent granted to him on an application filed April 15, 1925. The application of Burmeister, assignor of Pyrene-Minimax-Corporation, was filed April 26, 1926, and was based on a German application of May 8, 1925, claiming this latter date under the provisions of the International Patent Convention. The application of Urquhart, assignor of the American Fomon Company, was filed November 17, 1925, with a claim for conception and reduction to practice in the Fall of 1924.

There is but a single count in the interference which reads as follows: "The method of producing and delivering foam which consists in continuously flowing water from a source of supply toward the point of discharge of the foam, simultaneously and continuously introducing into the flowing water in advance of the point of discharge and in proportions substantially constant with respect to each other and also with respect to the rate of water supply, a foam stabilizer and acid and basic gas-generating reagents in solid form, and in quantities requisite to produce a mixture of foam and undissolved particles of said reagents, so that foam is formed when some of each reagent has been dissolved in the water and has reacted with the other, and passing the resulting mixture through a pipe or hose to effect, simultaneously, the transportation of the foam to a point of discharge and the dissolving and reaction in transit through the hose of undissolved particles."

After the declaration of the interference, Burmeister and Urquhart filed motions to dissolve upon the ground that the count was unpatentable. The motions were heard and overruled by the Law Examiner who held the count to be patentable.

Thereafter the cause came before the Examiner of Interferences, who, upon consideration of the testimony, awarded priority to Urquhart. An appeal was taken from this award to the Board of Appeals, and the Board reversed the decision of the Examiner and awarded priority to Palmer. This concluded the proceedings in the Patent Office.

Pyrene-Minimax Corporation, as plaintiff, thereupon filed its bill under section 4915, R.S. (35 U.S.C.A. § 63), in the District Court of the United States for the District of Columbia with Palmer, Amdyco Corporation, Urquhart, and American Fomon Company, who were the other parties in the interference, as defendants; and in a case concurrently filed under the same statute and in the same court, American Fomon Company and Urquhart brought suit against Amdyco Corporation, Palmer, Pyrene-Minimax Corporation, and Burmeister, as defendants. These two cases were consolidated for hearing and argument in the lower court and likewise on appeal in this court.

In the first of these two cases the plaintiff Pyrene-Minimax Corporation in its bill alleged that its assignor Burmeister was the first, original, and sole inventor of certain new and useful improvements in the "Method of producing foam generating liquids or an extinguisher foam itself," and that on April 26, 1926, he filed his application in the United States Patent Office for letters patent for said invention; that on May 8, 1925, he filed in the German Patent Office an application containing the same disclosures as that of his United States application, whereby, under the provisions of the International Patent Convention he became entitled to assert the date of filing of the German application as the date of his constructive reduction to practice. And plaintiff alleged that Burmeister and not Urquhart or Palmer was the first inventor of the subject matter of the count in the interference; that neither the application of Urquhart or Palmer contains a disclo-

sure sufficient to support a claim in the language of the count; that Palmer is not the inventor of the subject-matter disclosed in his application; that if construed so as to be supported by the disclosure contained in the applications of Palmer and Urquhart, the count is unpatentable, in that it is directed merely to the result or function of admitting powder into a water stream; that if so construed the count is unpatentable as defining subject matter devoid of utility; that Urquhart is not entitled to the award of priority of invention because he did not use due diligence in reducing to practice his alleged conception of the subject matter of the count; and that if the count be so construed as to be supported by the Palmer or Urquhart disclosures it is unpatentable in view of the disclosures of the prior art. Plaintiff therefore prayed that Burmeister be decreed to be the first, original, and sole inventor of the subject-matter and that Pyrene-Minimax Corporation, as his assignee, be decreed to be entitled to receive a patent for the invention.

The defendant Amdyco Corporation as assignee of Palmer, filed its answer in the suit claiming that Palmer conceived the invention as defined by the issue on or about December 18, 1923, and disclosed the same to others between that date and February 28, 1924, and reduced the invention to practice successfully between December 18, 1923, and prior to February 28, 1924, by constructing and successfully using an apparatus with the method of the count; that on or about September 1, 1925, it introduced the invention commercially and sold the same to the public; that Palmer was the first, original and sole inventor of the method described in the issue of the interference; and that Amdyco Corporation as his assignee, is entitled to an award of priority, and is entitled to receive a patent for the invention.

The parties Urquhart and American Fomon Company filed an answer in which they denied that Burmeister was the first inventor of the subject-matter of the count, and prayed that the bill of the plaintiff be dismissed. They stated that for reasons set out in a bill filed concurrently by them in the second suit they claimed that Urquhart was the first inventor of the subject matter, and that the American Fomon Company was entitled to a patent as his assignee.

The bill of complaint filed in the latter case by the American Fomon Company and Urquhart, together with the answers filed by the respective parties, present substantially the same issues as those presented in the former case.

After fully hearing the aforesaid cases the lower court in the first case held that the issue therein was patentable, and that Urquhart is entitled to a date as of the fall of 1924 for both conception and reduction to practice of the inventions which are within the scope of his claims as involved in the interference, and has priority of date over the other claimants; and that he is not estopped from making these claims. The court therefore dismissed the plaintiff's bill in that case.

In the second case the court similarly held in favor of Urquhart and decreed that the Commissioner of Patents be authorized to issue letters patent for and covering the invention to his assignee, the American Fomon Company.

Whereupon, Pyrene-Minimax Corporation, together with Burmeister, appealed both cases to this court.

The appellants in this court in their brief allege that lower court erred as follows:

"In failing to hold that the count, the subject matter of the interference here in issue, did not represent invention in view of the art.

"In failing to hold that the count, the subject matter of the interference here in issue, was not patentable because for a result.

"In failing to hold that the applicant, Urquhart, was not entitled to a date as of the Fall of 1924 for both conception and reduction to practice of the alleged invention constituting the subject matter of the interference here in issue."

We are of the opinion, however, that the subject-matter of the interference represents invention and is patentable, and that it is not anticipated by any of the references to former disclosures set out by the appellants.

The Cowing patent, No. 102,229 (1870), to which appellants refer as an anticipation of the invention, discloses a device consisting of "an air-tight case, chest, box or other vessel" for containing sulphate of ammonia, bicarbonate of soda and other like matters, neither of which reacts

with the other to form foam, and makes no indication whether the chemicals are to be dry or in solution.

The Law Examiner spoke of the Cowing patent as follows: "There is no teaching or suggestion in the patent that any such method may be carried out by the apparatus, even assuming that chemicals producing foam are supplied to the Case A."

The Connelly patent, No. 208,375 (1878), referred to by appellant, is not in point inasmuch as it does not deal at all with the production of foam.

The Law Examiner reported on the Connelly patent as follows: "The Connelly patent does not instruct the public how to use the apparatus in any way to carry out the method. There is no suggestion of producing and delivering stabilized foam, and while at the present time the production of foam lacks novelty, it is not certain that if ingredients suitable for foam were used in the receptacles D of Connelly's machine the method of the count would necessarily be followed in the use of the machine as described by Connelly."

We think these conclusions of the Law Examiner are correct.

In respect to the Scheuffgen No. 1,118,952 (1911) and Lunoe No. 1,113,228 (1914) patents we are of the opinion that the present invention is not anticipated by their disclosures. We do not find in either of them a means for the production of foam in the manner prescribed by the count. While it does appear that the teachings of the Scheuffgen patent disclose a use of foam-forming chemicals together with a stabilizer; and the teachings of the Lunoe patent show an apparatus for introducing dry chemicals into a flowing stream, we nevertheless do not regard them as anticipations of the count. The distinctions are apparent; the Scheuffgen patent contemplates no method of producing foam by an introduction of dry chemicals into continuously flowing water from a source of supply toward a point of discharge; and the Lunoe patent does not contemplate foam or the method of producing foam at all, but is merely a mechanical feeder or mixer.

Upon careful examination and consideration, we are likewise of the opinion that the McElroy & Shepherd (No. 1,829,714) as well as the Giedeon & Wildi (German Patent No. 20,920) patents form no anticipation of the complete method of the count here involved.

It appears that prior to the date of the present disclosures, the means of extinguishing oil fires consisted of a tank system comprising permanently installed storage tanks of a large capacity containing different solutions which when combined by a mixing device produced foam. The mixed solution thus formed when discharged by suitable means upon the fire extinguished it by a blanket of foam.

In illustration of these systems the following extract from the testimony of Mr. Timpson, appellants' witness, is instructive: "Prior to 1926 I did not know of any commercial installation or use of a system of adding dry powder to a stream of water to make foam. Since 1926 there has been a very considerable development of this type of fire extinguisher, involving the addition of dry powder to a stream of water comparable with the whole art of foam. * * * In other words that system of putting out fires, with dry powder fed to a stream of water has spread all over this country. It has spread all over the world in the same way."

The claim of conception and reduction to practice of the Urquhart invention in the fall of 1924, if established, would give it priority in time over the other applications involved in the interference. We think, the testimony establishes Urquhart's claim to this date.

Urquhart testified that he had been employed as a salesman of foam stabilizers, and that he invented the subject matter of the count some time prior to December 18, 1923; that shortly before that time he wrote to Mr. Denny, an attorney, that he was developing an entirely new method in controlling the use of foam in fighting oil fires which did away with a lot of the expensive apparatus necessary in installations then in use; that his method roughly was to combine the three chemicals in one and mix these three with water at the fire where it is to be used. He made sketches of the invention at that time. His general idea was to introduce foam forming chemicals mixed together into water where the water was coming from a hydrant in a hose line or pipe and the chemicals were to be fed into this water which would produce foam and the foam would be delivered to

the burning surface. He produced sheets showing the progress of his study upon the subject. In the spring of 1924 his brother, Gordon Urquhart, was working on the proposition of using chemicals to combat the Japanese beetle epidemic, and he spoke about injecting these chemicals, for killing the Japanese beetle, into water. Urquhart then "figured that if chemicals could be injected into water for such purpose he ought to be able to inject foam forming chemicals into water." On April 15, 1924, he wrote a letter to Mr. Christian of the Bethlehem Ship Building Corporation in which he said: "I believe that equipment developed to handle 1-2-3* for the purpose of making foam is applicable both to land and marine installations. A number of small tests have been made with model equipment and the results are more than satisfactory. The foam produced equals in every way the foam that is made under the old idea and I believe we both realize that the saving in doing away with the two tanks, acid resistant pumps, double pipe lines, will cut down the cost of this type of installation more than half of the former type. I have also had tests made using salt water instead of fresh water and find very slight differences in the characteristics of the foam produced this way. This method is the simple method of either injecting dry powdered Amdyco, aluminum sulphate and bicarbonate of soda mixed into a flowing stream of water, or having a flowing stream of water pass over the mixture of the three ingredients."

About September 4, 1924, Urquhart consulted his brother, telling him that he believed it would be advisable to feed separately inert foam chemicals so that they would not have a chance to deteriorate and requested his brother to try out feeding them separately using one of his proportioners such as he had developed in connection with his Japanese beetle work. He told his brother that it would be advisable to use a divided funnel to feed the chemicals into his proportioner, and he supplied him with some samples of extinguisher charges. Some time after September 4, 1924, while it was still fall, he went to his brother's house on a Sunday where they made foam by introducing the separately inert chemicals into one of his proportioners. This work was done on the lawn of his brother's home in Cynwyd. The water entered the short side of the proportioner making a jet, which is an injector. A separate piece was used to keep the powders separate, and the large end of the apparatus had about five feet of chemical hose attached. Urquhart told his brother it would be advisable to feed the inert chemicals separately so that they would not have a chance to deteriorate. On a Sunday shortly afterwards they made foam by introducing the separately inert chemicals into one of his proportioners. The separate piece was used as a means of changing the powders as well as to keep them separate. The chemicals that Urquhart used for making foam with this device in the early Fall of 1924 were aluminum sulphate, bicarbonate of soda, and the stabilizer. The bicarbonate of soda and the stabilizer were poured on one side of the division and the aluminum sulphate was poured on the other side. Water was supplied to the apparatus from a garden hose such as was supplied on the proportioner. The result of pouring the aluminum sulphate in one side of the device and the mixed bicarbonate of soda and stabilizer in the other side and introducing water to the device by means of a hose, was that foam was produced. Foam was made with the device more than once on that Sunday. Urquhart disclosed his idea of this apparatus to the officials of the American Dyewood Company who said that it would not work. He discussed the matter also with various parties named in his testimony.

He further testified that he was President of the American Fomon Company, which specializes in extinguishing inflammatory liquid fires, particularly for the oil industry. He introduced a circular in evidence and testified that considerably over two hundred of the apparatus illustrated in it were in use and considerably over five hundred thousand pounds of chemicals. That it is in use in every section of the United States as well as in foreign countries. As representative users of the apparatus he named the Cities of Baltimore, Providence, St. Louis, and about twenty-five other municipalities, and a few prominent corporations such as Standard Oil Company of California, General Petroleum Corporation, Sinclair Refining

---

* 1-2-3 is a dry mixture of "Amdyco" powder, which is a stabilizer tending to strengthen and toughen the foam, together with aluminum sulphate and bicarbonate of soda.

Company, Standard Oil Company of New York, Oregon McKinney Steel Company, and the Pan American Petroleum Corporation.

The testimony of Urquhart was supported by numerous illustrations which were placed in evidence and also by the testimony of other witnesses including his brother who, in part, testified in relation to the Cynwyd performance as follows: " * * * The device discharged a foam blanket onto the ground which continued to expand. The quality of the foam was good; in fact, it was quite similar to the foam which I had produced in the wash basin at the office. My brother asked me what I thought of the proposition. I informed him that I should like to work and study over the facts before rendering an opinion as to what I would consider a device which could be operated by the layman. He seemed rather impatient but I did not feel that any means of controlling the chemical feed should rely entirely upon the flow or suction of chemicals into a chamber which would probably be used over a period of years with chemicals of possibly varying physical characteristics. I had perfected a rather delicate mechanism for the introduction of fluids and I saw no reason why I should not proceed to further develop a device which while obviously operable might be improved, at least study would give information of value."

It was found by both the Examiner of Interferences and the Board of Appeals that the testimony before them disclosed prior conception of the invention by Urquhart, and it was held by the Examiner that it disclosed also prior reduction to practice. The Board of Appeals held that the test at Cynwyd failed to disclose a prior reduction to practice by Urquhart, but was no more than an abandoned experiment. However, we are of the opinion that the evidence of the proceedings at the home of Urquhart's brother at Cynwyd in the fall of 1924 establishes a reduction to practice as of that date. The record is convincing that foam was produced; and we think it was produced in accordance with the method prescribed in the count here involved.

A reduction to practice is accomplished when the inventor's conception is embodied in such form as to render it capable of practical and successful use. The end sought in the instant case was the production of foam, and the testimony, we believe, amply discloses that this was done by a method within the count in issue.

We are therefore constrained to agree with the decision of the lower court that the testimony establishes a reduction to practice by Urquhart as of the fall of 1924. For consistent decisions see Amdyco Corporation v. Urquhart (D.C.) 39 F. (2d) 943, affirmed 51 F.(2d) 1072, certiorari denied 284 U.S. 689, 52 S.Ct. 265, 76 L.Ed. 582; and also the case of Urquhart v. Burmeister, 69 F.(2d) 535, 540 (Cust. & Pat.App.). In the opinions delivered in these cases as well as the decision by the Examiner of Interferences, the testimony upon the subject of Urquhart's conception and reduction to practice is discussed and a decision sustaining Urquhart's date as of the fall of 1924 for conception and reduction to practice is unanimously adopted.

While we do not regard these authorities as conclusive of the present issue under the rule of res adjudicata we consider them entitled to great weight when passing upon the evidence in this case.

It is contended by Pyrene-Minimax Corporation that the count in question is not patentable. In so far as its instrinsic qualities are concerned, we think, however, that this count in fact discloses a new and useful invention possessing both novelty and utility.

■ It is charged that the lower court committed error in failing to hold that the count, the subject matter of the interference here in issue, was not patentable because for a result. In our opinion this assignment is not sustained by the record. The apparatus, together with the method of functioning of its various parts, as well as the purpose accomplished by them are all set out in the issue as well as the result. The count very clearly shows itself to be a method of producing foam in a particularly described and limited way. We cannot, therefore, agree with appellant that "the count is so broadly drawn that in effect it is for a function."

Several questions of procedure have been suggested by the respective parties in the case, which we have not discussed in this opinion for the reason that they seem to us to be unimportant in view of our decision upon the controlling issues in the case.

Upon a review of the entire record we hold that Urquhart was the first and prior inventor of the count in issue and that American Fomon Company as his assignee is entitled to receive a patent therefor.

The findings and decrees of the lower court in both cases are therefore affirmed, with costs.

Affirmed.